The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons have in their manner, form, or business before the Honorable of the United States Court of Appeals for the Fourth Circuit are marked to draw not and give their attention. For the Court is now sitting. God save the United States and its Honorable Court. All right. Good morning, everybody. Welcome to the Fourth Circuit. Can everybody hear me okay? Yes, Your Honor. Yes, Your Honor. And my colleagues, Judge Floyd. Yes. Judge Halston. Yes, sir. Good morning. Wonderful. Well, first of all, I want to thank the Court staff for powering through what are very difficult and uncertain times. Obviously, this is not ideal, but it is important that we continue to keep operating with the government so that people have continued confidence in what it is that we do each and every day. And I appreciate the fact that you all are here to this case that is important to your clients along. I want to thank Judge Rossi Halston from the Eastern District of Virginia for joining us this morning. We very much appreciate Judge Halston filling in to help us do our important work. We are prepared now to hear our argument in the case of Hill v. Employee Resource Group 18-2009. And Mr. Schaffer, whenever you're ready. Thank you, Your Honor. May it please the Court. My name is Bradley K. Schaffer. I'm with the firm of Minster, Sarowitz, Zeres, Ledva, and Myers, and I represent the appellants in this case. This is a class action case filed on behalf of former and current employees of a company called Employee Resource Group, which operates Applebee's restaurants in the states of West Virginia, Ohio, Kentucky, and Virginia. The relevant time period at issue is 2011 to 2016. The issue that brings us here today is whether or not there is sufficient evidence of a mandatory arbitration agreement that includes a class action waiver. There is an opt-in class of about 840 employees. Employee Resource Group has produced arbitration agreements for about 780 of those employees, and we are missing signed arbitration agreements of 60 employees. I'm sorry, I need to raise my hand, Mr. Schaffer. I thought the missing number of agreements was closer to 71, is that correct? I have in the briefing 60, but I do know that the parties have disagreed over a number of things involving the arbitration agreement, and I think they also have some concerns over the documentation when we moved from a wet signature to a digital signature, so there are some background disputes. Just as a follow-up to that, Mr. Schaffer, again, if I may, I thought the number of the actual opt-in plaintiffs, the ones that are relevant for purposes of our discussion, is closer to somewhere around 300 some-odd opt-in plaintiffs, and if that number, 71, by my reckoning, your client can't produce agreements for, and then there is another subset for which there are only partial agreements, and then there are a number, 100 or so, for which there are agreements. I guess my question to you is, given those numbers, how can we as a court say that the district court erred in declining to find as a matter of law that this particular appellant for which you could not find an agreement and who has specifically denied that she ever signed an agreement, how can we reasonably decide that that was an error that we should reverse? Well, I think the issue comes down to the types of evidence that has been presented in other cases. Most of the cases that have been cited, if not all of the cases, involve the scenario of just one or two employees or persons where the arbitration agreement is missing, and then the other party produces a witness that signs an affidavit saying, I saw her sign this. You're correct. We do not have that information in this case because this is a restaurant situation with a high rate of turnover and all of those things. But what we do have in this case is a huge amount of circumstantial evidence as to the existence of these contracts. We have all of the documents, and they have been produced in terms of what the arbitration agreements are from year to year to year to year, going back to the year 2005 and carrying forward to 2016. We have the deposition testimony of the HR director, David Bates, stating that it is a corporate policy that the arbitration agreement is a condition of employment. As to the person you say, your human resources person, isn't that a good bit remote? He's just a policy person up the chain. How does he know that the things that they're supposed to be doing on the ground were carried out? Well, a good example of that is the fact that we have produced 780 signed arbitration agreements. That's pretty good evidence that this is taking place. Mr. Bates also provides training to the management employees at all the different restaurants. Do we have any evidence with respect to that 780 out of how many employees total? I apologize. I do not know the total number of employees from 2011 to 2016. It would seem to me that that would be important to figure out exactly just how compliant your client has been with respect to these arbitration agreements. One of the issues that we had in this case is the storage and filing of these arbitration agreements and the numerosity of employees. The decision was made to look at the opt-in class. From that class, the people that are complaining that they have insufficient tips in the minimum wage violation, can we find the arbitration agreements for them, how many of that group is missing? I think that's what we've done in this case. Excuse me. Why aren't you asking for a jury trial under Section 4 of the Arbitration Act in this case? I think that sufficient evidence has been produced that there is an arbitration agreement that everybody has signed. Plus, the arbitration agreement has a delegation clause requiring that questions of arbitrability and scope be resolved by an arbitrator. An employee resource group would much rather prefer to have an arbitrator. Is that your position as to the existence of an arbitration agreement, that it's for the arbitrator? No, Your Honor. I think the case law is clear that it's up to you to make the initial determination as to whether or not a contract does, in fact, exist. Once that determination has been made, any questions regarding scope or whether an issue falls within or without arbitration, that is for an arbitrator to make. Do you agree that there is a heightened standard of proof in this case? It's not just preponderance of the evidence, but it's clear and conclusive? I agree it is a heightened standard. I believe the case from West Virginia, Marshall v. Elmo, Greer & Sons, uses the language high degree of proof. So, yes, we are at something more than a preponderance of evidence. We're around the clear and convincing standard. But I think the circumstantial evidence... Mr. Schaffer, can I follow up on Judge Floyd's question regarding a trial? The statute seems to pretty clearly suggest that if there is some doubt or some factual dispute about whether or not the party in question actually signed an arbitration agreement that the district court is then duty bound to simply proceed to a trial. No one raised this issue with the district court below. Am I understanding you to say that you are not pursuing that? You're essentially forfeiting that argument that you either rise and fall on the question of whether as a matter of law there is sufficient evidence to support an arbitration agreement and if there isn't, that's the end of the story as far as you're concerned. Or if there is. Go ahead. I think the issue before this court is the ruling by the trial judge. Challenging that at this point. Obviously, our hope is that you'll reverse that and make a finding that sufficient evidence is produced. If, in fact, you don't, then the case would get remanded back to the trial court and we would then have a decision to make in terms of going forward with that jury trial on this narrow issue that you raised. Well, why should you get two bites at that? Well, I think that the case law is pretty clear that a ruling on an enforcement motion to enforce arbitration is an immediately appealable ruling. So here we are because we have that ruling and it is an immediate appeal. Counsel, I have a question. The standard of review in this case is essentially that it's a de novo review. But do you agree or disagree that the factual determinations that were made by the district court judge are observed from a different point of view or from a different standard? Are we to accept the factual determinations of the trial court with regard to the existence of the arbitration agreement? I don't think so. I think that we're at a de novo review. You have a huge stack of documents that have been produced by the appendix. I think that the court would certainly be within its right to review the evidence that has been presented, make its own determination, and make a ruling from that. If I could follow up on that, sir, the crux of the case, from my view, turns on whether or not there is an agreement, whether there's an agreement or not. And typically when we're talking about an agreement, we're talking about a meeting of clients. Do you believe that the failure of your client to produce the contract, at least as it relates to Ms. Hill, negates the ability of this court to find that there was an agreement? I don't think so because we have produced all of this circumstantial evidence as to what the agreement is. For example, my opponent cited in her brief on page 26 a case called Hero Products Incorporated versus Liberty Mutual Insurance. And the relevant language from that case was, we cannot state that a party can never approve the terms of an insurance policy without a copy of the policy or a reasonable facsimile thereof. But the party trying to do so certainly faces a formidable burden. Here, no jury could find, absent sheer speculation, the scope of coverage, relevant notice requirements, and all of the other aspects of the policy. This case is completely different. We know all of those things. We have produced all of the four arbitration agreements. We know what the terms and conditions were. We know how those terms have been revised from year to year. We know the process by which those forms are issued to the employees to get their acceptance. So I think that the issue that this court is being confronted with is to what degree, if any, something other than direct evidence, i.e. an affidavit saying, I saw her sign the determination in regards to making a determination as to whether or not arbitration agreements were agreed to and signed when that particular signature page cannot be found in the fines. And I would suggest that the answer is yes, you can consider circumstantial evidence in a case like this. Mr. Schaffer, a follow-up. Judge Floyd asked the earlier question about the key witness in this case, from your perspective, being the Human Resources Executive, which, as he pointed out, is far removed from what was happening on the ground. And my question to you is, do we know of those 760-some-odd agreements that were produced in the record, or at least the 760 opt-in plaintiffs? How many of those were actually connected to the restaurant where this particular appellee, Ms. Hill, worked? Do we know that? The appellee worked in the Elkins restaurant. I don't have a breakdown as to that restaurant in particular. I can tell you I have handled other cases dealing with that restaurant, and the arbitration agreement has been produced. I have a new one that just came in a few weeks ago. Obviously, we can't consider evidence in other cases, but my point is I would think it would be relevant, notwithstanding a general policy that suggests that these agreements are mandatory, it might well be relevant to decide, to determine this case or decide this case, whether that policy was being applied consistently across the board, across various local entities. And what you're telling me is you don't have any specific evidence as to the rate of compliance at this particular locale. Is that fair? At this particular locale, that's fair. In regards to the percentage of the opt-in class that has signed the arbitration agreements, that we have the arbitration agreements for, we do have that statistic. We do have the 780 signed arbitration agreements. It's all documented that we're either talking about 60 or 71 people, yet 780 has been produced. So I think that there is pretty ample evidence that this is a policy that exists. Going back to the question about Mr. Bates, he provides management training to all of the managers at the different restaurants that includes waiting on the arbitration agreement. Slides from those presentations are part of your exhibit. Every restaurant has a poster posted near the time clock with the other labor law posters that references the arbitration process, and that is part of the appendix in this case. So there is a great deal of evidence that has been presented in this manner as to the existence of the agreement, the terms of the agreement, how the agreement applies. Literally, it seems like in this particular case, the only evidence that is missing is a separate witness to say, I saw her for the actual agreement itself. Yes, Your Honor. I just wanted to let you know, you're about two minutes over, and that was part of the reason was the question that I asked, but I think I'm going to turn it over now to Ms. Kipnis, and you'll have some time for rebuttal. So thank you very much for your time. Ms. Kipnis. Yes, may it please the Court. Patricia Kipnis on behalf of Appley April Hill, who represents the conditionally certified class of Fair Labor Standards Act employees. In our view, the district court got it right because an employer cannot compel April Hill and 70 other employees for whom there is no evidence of a written arbitration agreement to arbitrate their claims against defendants. And I think I want to jump right into the numbers, because Judge Diaz put his finger right on what we think the issue is here. This 780 number that has been thrown around, in our view, really doesn't mean anything, because as you pointed out, Judge Diaz, there is no denominator here. They produced 780 agreements from, we don't know, 1,000, 2,000, however many employees, working across the restaurants in these four states. In our view, that metric just doesn't mean anything. And all that does mean something is this conditionally certified class of only 309 people, and of those 309, there's only 61 where they produced the full agreement. And all this is reflected in the report that we provided to the district court after she issued the order on arbitration. So only 61 were produced in full. 71, including April Hill, those are the 71 we're talking about today. No sign of whatsoever. And then the remaining 177, some portion was produced, and Judge Berger left it open below that we could still bring up any issues we have with the execution of those agreements. So really, we're talking about a quarter of the class. Can I ask you about the procedural posture of this case? Do you think that implicit, or perhaps it was explicit in the district court's ruling in this case, was a finding not only that as a matter of law, the employer had failed to show that there was an agreement, but that as a matter of law, there is no dispute that there was no agreement in this case, such that there is no need for a trial. Where do you stand on that? I think she followed the procedure, which is that they didn't meet the summary judgment standard that they need to produce, that they didn't meet the threshold of there was no genuine issue of fact as to the existence of the agreements. So in your mind, if this case were to go back, the employer would not then be able to say, Judge, it's time now to hold a trial. I'm sorry, I haven't looked at that issue. I don't think that they've waived that right, though, to be candid, that there could be no trial on these issues. Well, the statute seems to contemplate a finding by the court in the first instance if there is no material issue as to whether or not there was an agreement and whether or not, in this case, the employee failed to comply with the agreement. It seems like the district court found that there was not enough evidence to support a summary ruling. But my question is, do you think, first of all, I guess the first question is whether or not this issue is even preserved since the employer never asked for a trial below. And if it is or somehow plain error applies, whether this case, if and when it goes back, that the district court would be obliged to hold the trial. Do you think that the district court in this case, implicit in her ruling, was a finding that your client prevails as a matter of law because there simply is no dispute as to whether or not there was an agreement? Well, I think I'd first say that they didn't preserve that issue and didn't request a trial. And I guess I can't say whether it was implicit in her ruling or not. I don't I don't think that she addressed it below. OK. Ma'am, other than the production of the arbitration agreement itself, what other evidence do you think that ERG should have produced to establish the existence of an arbitration? Sure. And we've seen that, Judge Floyd, in a lot of other cases. What I mean, it's not impossible and we'll concede that it's not impossible to prove the existence of an absent contract and meet those state law standards. But what other people have done is provide testimony from one or both of the signatories, provide testimony from a witness, provide statistical evidence. So, you know, we might not be here today if they produced rather than only, you know, 77 percent of the agreements, 99 percent of the agreements. So some kind of statistical evidence supported even by a statistician expert of that of that nature. Evidence of the terms in the applicable agreements. So you saw that in some of the cases where the applicant was able to say, well, I know they signed this agreement and here are the exact terms here. We have agreements that changed every year and we don't know which agreements these absent agreements were. Let me ask you this. Of the 71 people other than Miss Hill in her deposition, have any of the other 70 parties to this suit say that they did not sign that agreement? No, we don't have any testimony from them either way. And it would be our position that that would have been defendant's burden to obtain that evidence if they wanted to use it in support of their motion. So we don't have evidence about those 70 people's recollections of this event. And we also don't have any testimony from their own managers. So, as you pointed out earlier, Mr. Bates was, in fact, removed from all of these events. And I have no doubt that in his mind this policy existed, but he certainly didn't provide very reliable testimony about what exactly happened on the ground in each restaurant as each person was going through this onboarding process. He wasn't even able to say. Yes, Your Honor. Counsel, I think you would agree that the standard of review in this case is de novo. What should this court do with the credibility or factual determinations made by the trial court below? I think an affirmance would be appropriate because the district court went through all of the facts. I mean, she didn't discount any of the facts presented by defendant. All of those are recited in her opinion and were obviously considered by her. But it's really the absence of enough facts to meet their burden that I think is what led to her decision. And I think that the Kamara case that we submitted to the court last week that was just issued by the D.C. Circuit Court really supports the way that Judge Berger saw these facts below. Where the D.C. Circuit Court pointed out it's not the plaintiff's job to prove a negative. I mean, it's a little bit impossible for us to be in a position where we have to prove something didn't happen other than saying, well, they haven't met their burden to prove that it did. And just to go through the circumstantial evidence, which is what I heard my friend on the other side talk about a lot, that they have enough circumstantial evidence. I mean, our view is that this evidence just raises so many more questions than it answers. I mean, you see in some of the other cases that if there was at least a plausible reason for the missing agreements, you know, there was a fire, there was a theft, the files were moved. You know, some kind of reason that they could point to that that really would bolster the circumstantial evidence. And we don't have that here. We just have a lot of missing agreements. And we don't know why. We don't know what happened to agreements after they were supposed to be signed. We don't know what the record keeping processes were supposed to be. We don't have any testamentary evidence from any of the signatories. In Mr. Bates original affidavit, he talks about various managers. That's his quote is various managers were trained. So we don't even have testimony that all of the managers were trained. And we don't even have sound testimony about what happened if employees chose not to agree to arbitration. Mr. Bates testimony was actually that he didn't know what would happen if an employee happened to say, you know, I don't like arbitration. Can I still work here if I don't sign? His testimony was that he didn't know if people were actually told to go home if they didn't sign. That's in his testimony. So we just don't have enough here. I mean, the court recognized all the standards. I mean, they had to meet not only the state law standards for proving a missing contract, which are within those four states, a variation of clear and conclusory, as well as meet the summary judgment standard here. And they just didn't meet it. If the court has no further questions, I am done. But I do appreciate you hearing us virtually today. And I ask that you please affirm the district court's decision. Thank you. Do any of my colleagues have any additional questions for turn it over to Mr. Schaefer? No. All right, Mr. Schaefer, you have some. Thank you, Mr. Kipnis. You have some time for rebuttal. Mr. Schaefer, go ahead. Thank you, Your Honor. The language out of the order that we're arguing about today is as follows. The defendants asked the court to blame inconsistent record keeping and assume that each employee signed the agreement in accordance with corporate policy. The court sees no reason to assume that record keeping was inconsistent, but that adherence to a policy instructing many disparate employees to ensure applicants signed the agreement in uniform. That's number 37 in the appendix, page number 2451. The problem with that language is, one, it raises the specter of Wal-Mart versus Dukes in terms of destroying the idea of commonality amongst the class, which is essential for a class action. But it also shows to the degree the court completely disregarded all of the evidence we've been discussing thus far. There's no dispute in this case that the personnel file for April Hill is missing. There is no dispute in this case that these other arbitration agreements after going to the storage facility were missing, but yet all of these others were there. So I think the evidence is pretty clear about the issue with our filing system. I did want to speak very briefly on the issue. Counsel, if I could follow up on what you're talking about, Mr. Bates, and I'm going to read from the record what Mr. Bates, who is the HR person, said. When questioned about whether all of the documents concerning new employees' orientation materials, including the arbitration agreement, were produced, Bates replied, quote, I think the last upload we did was, I mean, it's been some time. It is possible, and you should know that, you know, maybe while they're cleaning out a storage locker or something, they'll find one that would be, I'm just throwing things out here. That would be an anomaly. But I feel everything that we're saying we have been produced. Wouldn't you agree that at a minimum, Mr. Bates' testimony is at best equivocal with regard to even supporting the policy? I think Mr. Bates' testimony was a desire not to completely close the door on the possibility, as remote as it may be, that somewhere in the future, one more arbitration agreement may be found. In his deposition, he was also pretty clear as to what lengths the company had taken, that each restaurant had reviewed the files that it had kept, that each restaurant went to its own storage facility and tried to find the files and go through. This was a lengthy process, a time-consuming process, as I'm sure you can imagine. So as agreements were found, they were uploaded, and so we had this process here. In terms of... But wouldn't you agree that when he says, I'm just throwing things out here, that that affects the burden that has to be met in this case for proving the existence of an agreement? I don't know that it affects the burden of proving the existence of an agreement. I think it goes to whether or not Mr. Bates is 100% confident that each restaurant manager did all that could possibly be done to find these agreements. I think it's open for the possibility that another arbitration agreement might be found somehow, that it was stuck in somebody else's file or sent to a different facility or something like that. In regards to the change in the form of the arbitration agreements, you'll note when you look at them, some of them are a long form with a wet signature at the end, and then some of them are very short, with just the name, type, and a date. Those are digital signatures that they sign off on, along with receiving employee handbooks and whatnot, because as the time progressed here, we moved from a paper file system to a digital file system. Each of those typewritten signatures is created by a computer where the employee logs in using his or her own unique password and username as discussed in Mr. Bates' deposition. So I didn't want the court to be confused by this issue of a change in the format of the arbitration agreements. With that, I think that employee resource group is short of naming a witness that says, I saw this signature, I saw them sign the contract, or coming forward with the actual signed contract. I think in this case, employee resource group has pretty much done and produced almost everything it possibly could to prove that there is in fact a company-wide policy for having a new employee sign the mandatory arbitration agreement, and that we do in fact have such an agreement with the class action Thank you. Thank you very much, Mr. Schaefer. I want to thank both counsel for appearing before us this morning. As you probably know, in our tradition, we would customarily come down from the bench and greet you personally. We can't obviously do that here today, but we want to tell you how much we appreciate your work on this case. As we tell lawyers often when we appear in Richmond, this is a collaborative effort. We all work together toward ensuring justice for all, and we can't do that important work without counsel being effective and being prepared, and I think we saw that here today. So thank you very much for your arguments. The court will take this case under advisement and get back to you as soon as we can. So with that, the court stands adjourned. The panel is going to reconvene shortly to conference this case, but at this point we'll say goodbye to the lawyers. Thank you very much.
judges: Albert Diaz, Henry F. Floyd, Rossie David Alston Jr.